# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BILLY RAY PATTERSON,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. CIV-19-627-R** |
| | ) | |
| **RURAL WATER DISTRICT 2, COTTON** | ) | |
| **COUNTY, DAVID RODRIGUEZ,** | ) | |
| **UDELL "SCOOTER" QUINN** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Before the Court is the Motion to Dismiss, Doc. No. 9, filed by Defendants Cotton County Rural Water District 2 ("CCRWD"), David Rodriguez, and Udell Quinn pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff responded, Doc. No. 10, and Defendants replied, Doc. No. 11. Upon review of the parties' submissions, the Court grants Defendants' motion in part and denies the motion in part.

### I.     Background

Plaintiff filed this action against his former employer, the CCRWD, and two of his former supervisors, Mr. Rodriguez and Mr. Quinn. The Complaint alleges a variety of claims arising out of the termination of Plaintiff's employment with the CCRWD. In general, Plaintiff alleges that his termination, and the events leading up to it, demonstrate that Defendants discriminated against him on the basis of age and associational disability.[1]

---

[1] Plaintiff was born in October of 1957 and was therefore over the age of 40 during the relevant period. Additionally, Plaintiff's wife—and co-worker—was a qualified individual with a disability under the Americans with Disabilities Act ("ADA"), the Americans with Disabilities Act Amendments Act ("ADAAA"), and state law.

In particular, Plaintiff asserts the following seven claims: (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (2) associational disability discrimination in violation of the American with Disabilities Act ("ADA"), American with Disabilities Act Amendments Act ("ADAAA"), Rehabilitation Act, and the Oklahoma Anti-Discrimination Act ("OADA"); (3) retaliation for engaging in protected opposition to disability discrimination in violation of the ADA, ADAAA, Rehabilitation Act, and the OADA; (4) violation of Plaintiff's First Amendment right to free speech; (5) violation of Plaintiff's Fourteenth Amendment right to equal protection; (6) tortious interference with a contract; and (7) tortious interference with a prospective economic advantage. Claims one through three are asserted only against the CCRWD; claims four and five are asserted against the CCRWD, Rodriguez, and Quinn; and claims six and seven are asserted only against Rodriquez and Quinn.

Defendants CCRWD, Rodriguez, and Quinn move for dismissal of all seven claims. The CCRWD argues that it is entitled to Eleventh Amendment immunity from all of Plaintiff's claims because it is an arm of the State of Oklahoma. The Individual Defendants also claim immunity from Plaintiff's federal claims and assert that Oklahoma law preempts Plaintiff's state law claims.

## II.    Standard of Review

Defendants ask this court to review their entire motion pursuant to Federal Rule of Civil Procedure 12(b)(6). However, Defendants' first argument for dismissal involves the CCRWD's assertion of sovereign immunity—challenging the Court's subject matter

jurisdiction.[2] Therefore, Court considers Defendants' first assertion pursuant to Rule 12(b)(1). *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may take one of two forms: a facial attack or a factual attack. *Id.* at 1002–03. A "facial attack . . . questions the sufficiency of the complaint." *Id.* A factual attack goes "beyond allegations contained in the complaint and challenge[s] the facts upon which subject matter jurisdiction depends." *Id.* Defendants' assertion of sovereign immunity is a factual challenge. In this context, the Court "may not presume the truthfulness of the complaint's factual allegations," and it "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Herrera v. Las Cruces Pub. Sch.*, 695 F. App'x 361, 367 (10th Cir. 2017) (citing *Holt*, 46 F.3d at 1003). Because the jurisdictional issues here are not intertwined with the merits of the case, a "reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Holt*, 46 F.3d at 1003.

Defendants' other arguments discussed herein are appropriately considered challenges made to the sufficiency of Plaintiff's Complaint under Rule 12(b)(6). In considering Defendants other arguments, the Court must accept all the well-pleaded allegations of the Complaint as true and must construe the allegations in the light most favorable to Plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). In doing so, the Court must determine whether Plaintiff has stated a claim upon which relief may be granted. The

---

[2] On September 25, 2019, the Court ordered supplemental briefing on the issue of sovereign immunity. Thereafter, Defendants filed their supplemental brief, Doc. No. 13, Plaintiff responded, Doc. No. 14, and Defendants replied, Doc. No. 15.

motion is properly granted when the Complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Twombly*, 550 U.S. at 555. Plaintiff's Complaint must contain enough "facts to state a claim to relief that is plausible on its face" *id. at 570,* and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id*. at 555 (citations omitted).

## III.     Sovereign Immunity

Defendants first argue that all of Plaintiff's claims against the CCRWD—claims one through five—should be dismissed because the CCRWD is entitled to sovereign immunity under the Eleventh Amendment as an arm of the State of Oklahoma. Doc. No. 9, p. 5–8; Doc. No. 13; Doc. No. 15. In response, Plaintiff contends that the CCRWD is a political subdivision and thus not entitled to immunity. Doc. No. 10, p. 6–9; Doc. No. 14. For the reasons stated below, the Court finds that the CCRWD is entitled to immunity as an arm of the State of Oklahoma.

Under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal court[] . . . ." *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other political subdivisions. *See Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977). To determine the category into which a given entity falls, the Court considers whether that entity is, or is not, an "arm of the state." *Id*. The answer to this question depends, in large part, upon the Court's analysis of the "nature of the entity created by state law." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 & n. 5 (1997); *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000). If the entity is akin to an arm

of the state, it is entitled to immunity. *See Mt. Healthy*, 429 U.S. at 280; *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007). If, however, the entity is more like a political subdivision, it is not entitled to immunity. *Id.*

In determining whether the CCRWD is an arm of the state, the Court must consider four primary factors:

> First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose.

*Baca v. Colorado Dep't of State*, 935 F.3d 887, 926 (10th Cir. 2019), *cert. granted sub nom. Colo. Dep't of State v. Baca*, No. 19-518, 2020 WL 254162 (U.S. Jan. 17, 2020) (citing *Steadfast*, 507 F.3d at 1253). Neither the Supreme Court nor the Tenth Circuit has decided who carries the burden of persuasion regarding Eleventh Amendment immunity. However, every federal appeals court to address the question has placed the burden on the moving party. *See Thomas v. Guffy*, No. CIV-07-823-W, 2008 WL 2884368, at *4 (W.D. Okla. July 25, 2008) (collecting cases). This Court has previously supposed that the Tenth Circuit would reach that same conclusion. *Id.* Accordingly, Defendants carry the burden of persuasion regarding the factors mentioned above and discussed below.

## A. Factor one: Character ascribed by state law

First, the Court assesses the character ascribed to the CCRWD under Oklahoma law. Oklahoma's Rural Water, Sewer, Gas and Solid Waste Management Districts Act, 82 O.S. §§ 1324.1–35 provides that upon its creation a rural water district, like the CCRWD, "shall be a body politic and corporate and an agency and legally constituted authority of the State of Oklahoma for the public purposes set forth in this act." *Id.* § 1324.6. Interpreting this language, the Oklahoma Supreme Court has declared that a water district—like the CCRWD—created under 82 O.S. § 1324.6 is properly characterized as a "State agency" for jurisdictional purposes. *Sinor Long Bay Marina, LLC v. Wagoner Cty. Rural Water Dist. No. 2*, 2014 OK 43, ¶ 3, 335 P.3d 262, 263 (explaining that rural water districts are state agencies, not "persons" under the Antitrust Act). The Eastern District of Oklahoma has found the same, *see Barnes v. Wagoner Cty. Rural Water Dist. No. 4*, No. 15-CV-479-JHP, 2016 WL 1627622, *2 (E.D. Okla. Apr. 22, 2016) (characterizing a rural water district created under 82 O.S. § 1324.6 as "an agency of the State of Oklahoma" entitled to Eleventh Amendment immunity); so too has the Oklahoma Attorney General, *see* 2001 OK AG 38, ¶5 (explaining the legal history of rural water districts under 82 O.S. § 1324.6 in establishing that "rural water districts are State agencies"); 1985 OK AG 177, ¶8 (explaining that the language of 82 O.S. § 1324.6 "evidences clear legislative intent to bring these Districts into the fold of 'agencies' of the State."); 1984 OK AG 134, ¶5 (noting

that rural water districts are "instrumentalities" of the State of Oklahoma).[3] [4] Ultimately, each branch of Oklahoma's government views the CCRWD as an arm of the state. This first factor thus weighs strongly in favor of finding that the CCRWD is an arm of the State of Oklahoma and entitled to immunity from Plaintiff's claims.

Plaintiff's support does not contradict this conclusion. First, Plaintiff cites 51 O.S. § 152(11)(f)–(g) which he claims characterizes rural water districts as political subdivisions. Doc. No. 14, p. 3. His assertion is, however, incomplete and misguided. The statute's characterization of rural water districts as political subdivisions is "for the purposes of The Governmental Tort Claims Act ["OGTCA"] only." 51 O.S. § 152(11)(f)–(g). If Plaintiff's claims had been brought pursuant to the OGTCA, his argument that the CCRWD is a political subdivision not entitled to immunity would be correct. But his claims are not pursuant to the OGTCA. Therefore, his argument fails. In fact, it inferentially supports Defendants' contention that outside of the OGTCA context, rural water districts like the CCRWD are considered state agencies, not political subdivisions. Next, Plaintiff cites Okla. Admin Code § 785:50-3-2(a), which he argues defines political subdivision to include rural water districts. Doc. No. 14, p. 3. Plaintiff is mistaken. The code's definition of political subdivision does not include rural water districts. Rather, rural water districts

---

[3] The Oklahoma Attorney General explains that prior to 1965, rural water districts were not considered agencies of the state. 2001 OK AG 38, ¶4. However, the law was amended in 1981 to consider a district "a body politic and corporate *and an agency and legally constituted authority of the State of Oklahoma.*" *See* 82 O.S. § 1324.6 (emphasis added). In 1985, the Attorney General opined that the "statutory change evidences clear legislative intent to bring these Districts into the fold of 'agencies' of the State." 1985 OK AG 177, ¶8. And in 2001, the Attorney General stated firmly that "rural water districts are State agencies." 2001 OK AG 38, ¶5.

[4] The Tenth Circuit has previously held that opinions of Oklahoma's Attorney General, while not dispositive, offer guidance and are to be accorded some deference. *Southern Disposal, Inc. v. Texas Waste Mgmt., a Div. of Waste Mgmt. of Texas, Inc.*, 161 F.3d 1259, 1264–65 (10th Cir. 1998).

are included in the code as an example of "special purpose water resource districts" eligible for assistance under certain state programs. Okla. Admin Code § 785:50-3-2(a).

Finally, Plaintiff cites a number of federal cases, Doc. No. 14, p. 3, none of which undermines the Court's finding that Oklahoma law characterizes the CCRWD as an arm of the State. *See Gunn v. Consol. Rural Water & Sewer Dist. No. 1, Jefferson Cty., Okl.*, 1992 OK 131, ¶ 2, 839 P.2d 1345, 1346-47 (finding that rural water districts are political subdivisions "only for purposes of the [OGTCA's] coverage"); *Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694 (10th Cir. 2004) (labeling a rural county water association a "subdivision of the State of Oklahoma" without any state-law analysis); *Reddell v. Gammill*, No. 12-CV-379-JED-FHM, 2019 WL 2717976, *2 (N.D. Okla. June 28, 2019) (noting, without reference to state law, that a non-party rural water district was a political subdivision); *Booze v. Pottawatomie County Water Dist. No. 3*, CIV-04-812-HE, slip op. at 19 (W.D. Okla. Oct. 5, 2004) (finding defendant rural water district to be a hybrid "public agency/political subdivision").

## B. Factor two: Autonomy under state law

Second, the Court considers the autonomy accorded the CCRWD under Oklahoma law—a determination that hinges upon the degree of control Oklahoma exercises over the CCRWD. In performing this analysis, the Tenth Circuit has considered state control over an entity's use of property, the entity's relationship with its employees, the handling of its finances, and its auditing and reporting requirements. *See Steadfast*, 507 F.3d at 1254–55.

According to 82 O.S. § 1324, *et seq.*, the State of Oklahoma exercises control over the CCRWD in several ways: the State directs the purpose for which the CCRWD can

generate revenues, determines what the CCRWD's revenues should be devoted to, *id.* at § 1324.11, sets term limits for the CCRWD's directors, details requirements for qualification to serve as a board member, sets meeting requirements, *id.* at § 1324.16, and prescribes how the CCRWD's officers are to be elected, *id* at § 1324.17. The State also requires the CCRWD to file annual financial audit reports, *id.* at § 1324.18, and controls the CCRWD's ability to export water to entities outside Oklahoma, *id.* at § 1324.10(B). In addition, the CCRWD is subject to the regulatory authority of the State of Oklahoma through two of its agencies—the Oklahoma Department of Environmental Quality ("ODEQ") and the Oklahoma Water Resources Board ("OWRB"). *See generally* Okla. Admin. Code § 252:626, 631 (detailing ODEQ's oversight of public water supply systems); 82 O.S. §§ 1324.6–16 (detailing OWRB's oversight of rural water districts).

Nevertheless, as Plaintiff points out, Doc. No. 14, p. 5, the CCRWD has extensive autonomy from the State of Oklahoma. The District is managed by a locally-elected board and has the capacity to sue and be sued, borrow money and contract indebtedness, make bylaws for the regulation of its own affairs, appoint officers, agents, and employees, sell or otherwise dispose of any property, enter into contracts, fix reasonable and nondiscriminatory rates, fees, rents or other charges for water, and to perform all acts and things necessary, convenient, or appropriate to effectuate its purpose. 82 O.S. § 1324.10.

Oklahoma law certainly provides the State with supervision and control over a number of the CCRWD's internal and external affairs. But it also grants the CCRWD considerable independence from the State. This second factor does not weigh clearly in favor or against a finding that the CCRWD is an arm of the State. *See T.D. v. Patton*, 149

F. Supp. 3d 1297, 1306 (D. Colo. March 16, 2016) (finding that the second element was a "mixed bag between aspects that indicate state control . . . and elements that indicate a lack of control . . . .").

In *Sturdevant v. Paulsen*, 218 F.3d 1160 (10th Cir. 2000), the Tenth Circuit encountered a similar situation. The entity asserting immunity in *Sturdevant*, a school board, had a significant degree of autonomy, but the state also had notable control over the board. There, the Circuit turned to what is now identified in *Steadfast* as the fourth factor to resolve the second—the Circuit considered the state's control "in light of the purpose, composition and function" of the entity in question. *Sturdevant*, 218 F.3d at 1168; *Steadfast*, 507 F.3d at 1253. (labeling an entity's autonomy from state control as factor two and analysis of the entity's purpose, composition and function as part of factor four). Other districts in this Circuit have mirrored this approach. *See, e.g., BPS v. Bd. of Trustees for Colorado Sch. for the Deaf & Blind*, No. 12-CV-02664-RM-KLM, 2013 WL 5382112, *6 (D. Colo. Aug. 21, 2013), *report and recommendation adopted*, 2014 WL 6990331 (D. Colo. Dec. 10, 2014) (evaluating an entity's autonomy in light of the entity's purpose, composition, and function where neither the State's control over the entity nor the entity's autonomy clearly demonstrated that the entity was a political subdivision or an arm of the State entitled to immunity).

Here, the Court is compelled to follow the Circuit's example and resolve the second factor by viewing the CCRWD's autonomy and Oklahoma's control in light of the fourth *Steadfast* factor—the purpose, composition, and function of the CCRWD. According to Oklahoma law, the CCRWD's purpose is to develop and provide "an adequate rural water

supply . . . to serve and meet the needs of rural residents within the territory of the district." 82 O.S. § 1324.3. It is composed entirely of locally-elected board members. *Id.* at § 1324.7. Its function is to construct, install, improve, maintain and operate water works in Cotton County, Oklahoma. *Id.* at § 1324.4(2). The CCRWD undoubtedly helps fulfill the State's public policy goals related to water protection, maintenance, improvement, and conservation—thus implicating statewide concerns. *See* 27A O.S. § 2-6-102. However, its purpose, composition, and function are concerned primarily with local affairs, much like a county or city. In light of this consideration, the Court determines that the second factor weighs slightly in favor of categorizing the CCRWD as a political subdivision.

### C. Factor three: Finances

Third, the Court studies the entity's finances. In accordance with the Tenth Circuit's instruction, the Court looks to the amount of state funding the entity receives and considers whether the entity can issue bonds or levy taxes on its own behalf. *Baca*, 935 F.3d at 926. The Court also looks to "whether a money judgment sought is to be satisfied out of the state treasury focusing on legal liability for a judgment, rather than [the] practical, or indirect, impact a judgment would have on a state's treasury." *Id.* at 23 (quotation marks and citations omitted).

The CCRWD is eligible to receive state funds through a number of assistance programs, *see* Okla. Admin. Code § 785:50-3-2(a), but Defendants do not contend that they have received any state assistance. Instead, Defendants acknowledge that the CCRWD is an unappropriated agency, meaning that the state's annual budget does not provide money

for its operations. The CCRWD generates its own revenue by charging fees for the water it supplies to residents of Cotton County. *See* 82 O.S. § 1324.10, 18.

Plaintiff contends that the CCRWD's ability to generate its own revenue provides compelling evidence that the CCRWD is not an arm of the state. Doc. No. 14, p. 8–9. Defendant argues that this status is immaterial based on the Tenth Circuit's findings in *Steadfast*. Doc. No 13, p. 7. In *Steadfast*, however, the Tenth Circuit considered it immaterial that the defendant, Grand River Dam Authority ("GRDA"), was an unappropriated agency that generated its own revenue only because that revenue constituted public funds—subject to state laws and regulations governing the receipt and expenditure of public funds in the same manner as all other state agencies. *Steadfast*, 507 F.3d at 1254–54. "That [the] revenue never entered the confines of the state treasury [was] immaterial" *Id.* Here, however, the CCRWD's revenue generation is material because the CCRWD's revenues are deemed "special" funds, not public funds. 82 O.S. § 1324.10. Any judgment entered against the CCRWD will likely be paid out of the CCRWD's special revenues—a conclusion asserted by the Plaintiff in response, Doc. No. 14, p. 8–9, and uncontradicted by Defendants in reply. At first glance then, the third factor weighs in favor of characterizing the CCRWD as a political subdivision.

However, the CCRWD has no "authority to levy any taxes whatsoever or make any assessments on property, real or personal." 82 O.S. § 1324.6. Neither does it have the authority to issue bonds on its own behalf. *See* Doc. No. 13, p. 7.  In granting an entity immunity as an arm of the state, the Tenth Circuit has found that the "absence of taxing authority and the ability to issue bonds, with certain state guidance, renders an agency more

like an arm of the state than a political subdivision." *Steadfast*, 507 F.3d at 1255 (citing *Sturdevant*, 218 F.3d at 1169-70). The CCRWD's inability to tax *or issue bonds* then presents an even stronger case for immunity than was present in *Steadfast*.

Ultimately, the Court determines this third factor to be neutral—some elements of the CCRWD's finances suggest it acts as a political subdivision, while other elements suggest it acts as an arm of the state. *See Lucero v. New Mexico Lottery*, No. CIV 07-499 JCH/RLP, 2008 WL 7467977, at *5 (D.N.M. July 7, 2008) (finding financial considerations to be neutral in determining whether the entity at issue was entitled to immunity).

### D. Factor four: Primary purpose

Fourth, the Court asks whether the CCRWD is concerned primarily with local or state affairs. To answer this question, the Court must examine the CCRWD's function, composition, and purpose—elements addressed above in the Court's discussion of the second *Steadfast* factor. In short, the CCRWD's function, composition, and purpose implicate state-wide issues, but are primarily concerned with local, not state, affairs.

\*     \*     \*

Overall, the factors analyzed above weigh in favor of finding that the CCRWD is an arm of the state. In summary, the first factor provides strong support for finding the CCRWD to be an arm of the state, the second factor is unclear on its own but supports a finding that the CCRWD is a political subdivision once it is evaluated in light of the fourth factor, the third factor is neutral, and the fourth supports a finding that the CCRWD is a political subdivision. The Court gives deference to state decisions in characterizing state

entities, *Steadfast*, 507 F.3d at 1253; *Sturdevant*, 218 F.3d at 1167, and the relevant state authority—analyzed under the first factor—strongly supports the conclusion that the CCRWD is an arm of the state for jurisdictional purposes, *see, e.g., Sinor's Long Bay Marina*, 2014 OK 43 at ¶ 3, 335 P.3d at 263 (identifying a rural water district created under 82 O.S. § 1324.6 as a "State agency" for jurisdictional purposes).[5] Accordingly, the CCRWD is an arm of the State of Oklahoma and is entitled to claim sovereign immunity under the Eleventh Amendment.

## IV. Waiver of Sovereign Immunity

Sovereign immunity is not, however, absolute. There are two exceptions to this immunity: "(1) when Congress has abrogated the states' immunity, as in legislation enacted to enforce the Fourteenth Amendment; and (2) when a state waives its immunity." *Pettigrew v. Okla. ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1212 (10th Cir. 2013). "The requirements for abrogation and waiver are strict." *Estes v. Wyoming Dep't of Transp.*, 302 F.3d 1200, 1203 (10th Cir. 2002). For Congress to abrogate a state's immunity, they "must identify conduct transgressing the Fourteenth Amendment's substantive provisions and must tailor its legislative scheme to remedying or preventing such conduct." *Id.* (quoting *Fla. Prepaid Postsecondary Ed. Expense Bd. v. Coll. Savings Bank*, 527 U.S. 627, 639, (1999)). Before the Court can conclude that a state has waived

---

[5] The Court is cognizant of the Tenth Circuit's admonition that rulings of state courts are not dispositive. *Steadfast*, 507 F.3d at 1253. Here, however, all three branches of the State of Oklahoma appear to be in agreement—they each characterize the CCRWD as an agency of the State. The other factors are insufficient to overcome this strong support for immunity. *See Kellogg v. Coleman*, No. 18-1061-JTM, 2019 WL 2207954, at *11 (D. Kan. May 22, 2019) (granting immunity to an entity based on an evaluation of state law under the first *Steadfast* factor because the remaining factors were insufficient to overcome the strong support for immunity found under the first).

its sovereign immunity, "there must be an unequivocal waiver specifically applicable to federal-court jurisdiction." *Id.* (citation and internal quotation marks omitted).

Defendants assert that neither exception is relevant to Plaintiff's claims under the ADEA, ADA, ADAAA, OADA, or 42 U.S.C. § 1983. Doc. No. 9, p. 5–8. Plaintiff does not address the issue. The Court determines that the CCRWD has not unequivocally waived its immunity from suit in federal court under any of the relevant statutes. Nor has Congress done so. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000) ("in the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals."). *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 n. 9 (2001) ("Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I of [the ADA]."); *Goodnow v. Oklahoma Dep't of Human Servs.*, No. 11-CV-54-GKF-FHM, 2011 WL 4830183, at *1 (N.D. Okla. Oct. 12, 2011) ("the ADAAA is devoid of language purporting to negate the constitutional limitation upon the authority of Congress to abrogate state sovereign immunity recognized in *Garrett*."); *Bruton v. Oklahoma Dep't of Corr.*, No. CIV-19-34-R, 2019 WL 3413853, at *4 (W.D. Okla. July 29, 2019) ("Congress did not abrogate states' Eleventh Amendment immunity in enacting 42 U.S.C. § 1983."). Therefore, Plaintiff's first, second, third, fourth, and fifth claims pursuant to the ADEA, ADA, ADAAA, OADA, and § 1983 cannot proceed against the CCRWD in federal court and are subject to dismissal.

Defendants also assert that neither exception is relevant to Plaintiff's claims under the Rehabilitation Act. Doc. No. 11, p. 4–5. They contend Plaintiff has failed to allege that the CCRWD receives federal financial assistance, and as a result, that Plaintiff cannot

establish that the CCRWD has waived its immunity under the Rehabilitation Act. *Id.* (citing *Arbogast v. Kansas, Dep't of Labor*, 789 F.3d 1174, 1183 (10th Cir. 2015) for the proposition that receipt of federal financial assistance is required for a valid waiver of immunity under the Rehabilitation Act). Defendants did not raise this argument until their reply brief. The argument is thus waived. *See Arbogast*, 789 F.3d at 1183 n.4 (treating immunity argument as waived where defendant raised the issue only in reply). What's more, based upon Plaintiff's limited response in his supplemental briefing, it would appear that the CCRWD did waive its immunity when it received federal financial assistance in the form of a federal mortgage loan. *See* Doc. No. 14, p. 2–3 n. 1, Ex. 2; *see also* 45 C.F.R. § 84.3(h).[6] Therefore, Plaintiff's second and third claims pursuant to the Rehabilitation Act are not subject to dismissal on the basis of the CCRWD's sovereign immunity.

## V.     Qualified Immunity

Defendants also argue that Plaintiff's fourth claim, pursuant to § 1983—alleging that the Individual Defendants violated his First Amendment rights—should be dismissed because both Defendants Rodriguez and Quinn are entitled to qualified immunity. Doc. No. 9, p. 8–10. Plaintiff contends that Defendants are not so entitled. Doc. No. 10, p. 10–12. Upon consideration of the issue, the Court finds that the Individual Defendants are entitled to qualified immunity, subjecting Plaintiff's fourth claim to dismissal.

---

[6] While the Rehabilitation Act does not define "federal financial assistance," *see* 29 U.S.C. § 705, the Department of Health, Education and Welfare—the agency charged by the Executive Branch with coordinating the issuance of regulations under the Rehabilitation Act, *see* Exec. Order No. 11914, 41 Fed. Reg. 17871 (1976)—has interpreted the phrase to include any loan of funds. 45 C.F.R. § 84.3(h); *see also Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir. 1984) (utilizing the definition of "Federal financial assistance" provided in 45 C.F.R. § 84.3(h) to determine whether compensatory payments constitute federal financial assistance under the Rehabilitation Act).

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). While some of the law surrounding qualified immunity is less than clear, "[w]hat is clear is that *Harlow* places the presumption in favor of immunity for public officials acting in their individual capacities." *Melton v. City of Oklahoma City*, 879 F.2d 706, 728–29 (10th Cir. 1989), *overruled en banc on other grounds by,* 928 F.2d 920 (10th Cir. 1991); *Malley v. Briggs,* 475 U.S. 335, 341 (1986) (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law. . . . [If officials] of reasonable competence could disagree . . . immunity should be recognized.").

"Although summary judgment provides the typical vehicle for asserting a qualified immunity defense, we will also review this defense on a motion to dismiss." *Sayed v. Virginia*, 744 F. App'x 542, 545–46 (10th Cir. 2018) (quoting *Peterson v. Jensen,* 371 F.3d 1199, 1201 (10th Cir. 2004)). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* "At the motion to dismiss stage, it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Id.* (citation and internal quotation marks omitted). "A plaintiff need only allege enough factual matter to state a claim that is plausible on its face and provide fair notice to a defendant." *Id.* (citation and internal quotation marks omitted).

Nevertheless, once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden. The Plaintiff must show: (1) that the defendant's actions violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Id.* (citations and internal quotation marks omitted). Accordingly, the court may consider either prong of the qualified immunity test first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court's analysis focuses on the clearly-established-law prong. To establish his First Amendment claim, Plaintiff alleges that his wife and co-worker had a disability, and that upon learning of Plaintiff's wife's disability, Defendant Rodriguez went to Plaintiff's home and demanded that Plaintiff's wife sign a document agreeing that if she were limited in performing her job or needed accommodation due to her disability, she would not continue employment with Defendant CCRWD. Doc. No. 1, ¶ 19. Plaintiff complained that Rodriquez was mistreating his wife based on her disability and asked Rodriguez to leave their home. Doc. No. 1, ¶ 20. Plaintiff alleges that after his grievance, Rodriguez began "nitpicking" Plaintiff ultimately leading to his termination in 2018. Doc. No. 1, ¶ 21–30. Upon consideration of Plaintiff's allegations, the Court finds that the Individual Defendants are not alleged to have violated a clearly established right under the First Amendment.

A right is "clearly established" only if it is "sufficiently clear that every reasonable official would understand that what he was doing was unlawful." *Singh v. Cordle*, 936 F.3d

1022, 1033 (10th Cir. 2019) (brackets, citations, and internal quotation marks omitted). "To make such a showing in our circuit, [usually] the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (citation and internal quotation marks omitted) A plaintiff does not have to supply a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741. "A plaintiff . . . must do more than cite case law announcing a legal rule 'at a high level of generality.'" *Yeasin v. Durham*, 719 F. App'x at 850 (quoting *Al-Kidd*, 563 U.S. at 742); *see also Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) ("Although it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.") (citation and internal quotation marks omitted).

Plaintiff does not point to a Supreme Court or Tenth Circuit decision on point, nor does Plaintiff cite a clearly-established weight of authority from other courts. Instead, Plaintiff points to one case from the Third Circuit announcing a legal rule at a high level of generality. *See* Doc. 10, p. 13. This is not sufficient to carry the Plaintiff's burden. *See Yeasin,* 719 F. App'x at 850. Even if Plaintiff could find a case to support his position, a full analysis of the "clearly established" prong demonstrates that the Individual Defendants are entitled to qualified immunity.

The First Amendment prohibits public employers from taking adverse action against employees because of their protected speech. To determine if an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment, we apply the *Garcetti/Pickering* test. *See Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014); *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). The test usually requires a plaintiff to establish five elements: (1) that the speech was not made pursuant to an employee's official duties; (2) that the speech was on a matter of public concern; (3) that the government's interests, as employer, in promoting the efficiency of the public service are insufficient to outweigh the plaintiff's free speech interests; (4) that the protected speech was a motivating factor in the adverse employment action; and (5) that the defendant would not have reached the same employment decision in the absence of the protected conduct.[7] *Knopf*, 884 F.3d at 944.

Here, the Individual Defendants dispute elements two and three. They argue that the speech at issue—Plaintiff's complaint to Defendant Rodriguez for allegedly treating Plaintiff's wife and fellow co-worker unfavorably based on her disability—primarily involved a matter of personal, not public concern. Additionally, Defendants argue that a reasonable person could have believed that the government's interest in promoting efficiency outweighed the Plaintiff's free speech interests. As to element two, according to Tenth Circuit law, if the speech at issue "is not a matter of public concern, then the speech

---

[7] "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury." *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014).

is unprotected and the inquiry ends." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007). Plaintiff objects, arguing that his protected speech was a matter of public concern.

Speech on a matter of public concern is speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147 (footnote omitted). Generally, "[s]peech concerning potential illegal conduct by government officials is inherently a matter of public concern*." Brammer-Hoelter*, 492 F.3d at 1206 (citation omitted). "But we must also consider the context of the speech, which encompasses the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Singh*, 936 F.3d at 1035 (citations omitted). "If an employee's principal purpose was to air a personal dispute, . . . his speech [is] not entitled to protection even if it touched on a matter of general concern." *Brammer-Hoelter*, 602 F.3d at 1188. What's more, Defendants' are entitled to qualified immunity if a reasonable person in their shoes could have believed that plaintiff was motivated primarily by personal grievance. *Singh*, 936 F.3d at 1036.

Plaintiff's speech did not address a matter of public concern. Even if it did, that reality was not sufficiently clear to put every reasonable official on notice. Plaintiff's speech—complaining to his supervisor about alleged discrimination—appears to be an inherent matter of public concern. *Brammer-Hoelter*, 492 F.3d at 1206 (citation omitted).

But the allegations suggest that Plaintiff's principal purpose in complaining was to air a personal dispute. Defendant Rodriguez traveled to the Plaintiff's house demanding that Plaintiff's wife and co-worker sign a document agreeing to resign if she ever needed accommodations in the future due to her disability. In response, Plaintiff "complained that Rodriguez was treating his wife unfavorably based on her medical condition and asked Rodriguez to leave their home." Doc. No. 1, ¶ 20. Based upon the facts alleged in the Complaint, Plaintiff did not raise the issue to anyone other than Rodriquez himself. Given that the alleged speech concerned the Plaintiff's wife, was made in the Plaintiff's home, and directed only to Defendant Rodriguez, it would be a stretch to categorize the complaint as speech addressing a matter of public concern. At the very least, the Individual Defendants are entitled to qualified immunity because it was not clear that Plaintiff's complaint in mid-2015 was protected speech under the First Amendment because it addressed a matter of public concern. In accordance with Tenth Circuit precedent, the Court determines that the speech is unprotected. Therefore, the inquiry is ended. *Brammer-Hoelter*, 492 F.3d at 1203.[8]

## VI.    Federal Preemption

Defendants further argue that Plaintiff's fifth claim, pursuant to § 1983—alleging that the Individual Defendants violated his Fourteenth Amendment right to be free from age discrimination—should be dismissed on the basis of qualified immunity and because Plaintiff failed to properly plead his claim. Doc. No. 9, p. 8–11. Plaintiff objects. Doc. No.

---

[8] Because the Court dismisses Plaintiff's First Amendment claim against the Individual Defendants on the basis of qualified immunity, the Court need not address Defendants' statute of limitations argument, Doc. No. 9, p. 11–12.

10, p. 10–12, 14. The Court need not address either parties' arguments; the issue is resolved on simpler grounds.

Section 1983 cannot be used to vindicate a violation of federal law where Congress has otherwise created a comprehensive enforcement scheme that is incompatible with individual § 1983 enforcement. *See Blessing v. Freestone*, 520 U.S. 329, 341 (1997). Both the Western District of Oklahoma and the Tenth Circuit have held that age discrimination claims brought under § 1983 are preempted by the ADEA, 29 U.S.C. § 621, *et seq. See Stevenson v. Indep. Sch. Dist. No. I-038 of Garvin Cty.*, *Oklahoma*, 393 F. Supp. 2d 1148, 1152 (W.D. Okla. May 19, 2005); *Migneault v. Peck*, 158 F.3d 1131, 1140 (10th Cir. 1998), *judgment vacated on other grounds*, 528 U.S. 1110 (2000) (citing *Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1369 (4th Cir. 1989)); *Migneault v. Peck*, 204 F.3d 1003, 1004 n.1 (10th Cir. 2000) (reaffirming, on remand, holding that the equal protection clause does not give rise to a cognizable claim of age discrimination). The ADEA "is a precisely drawn, detailed statute, similar to other statutory schemes which have been held to provide the exclusive judicial remedy for a stated abuse." *Zombro*, 868 F.2d at 1369. On this basis, Plaintiff's fifth claim for age discrimination under § 1983 is subject to dismissal.

## VII.   State Preemption

In closing, Defendants argue that Plaintiff's sixth and seventh claims against the Individual Defendants for tortious interference are preempted by the Oklahoma Anti-Discrimination Act (OADA), or in the alternative that they are improperly pled. Doc. No. 9, p. 11–14. Plaintiff argues that Defendants' assertion misinterprets the relevant case law and that properly interpreted, the case law requires denial of Defendants' motion. Doc. No.

10, p. 17–21. Upon consideration of the issue, the Court determines that Plaintiff's sixth and seventh claims are preempted by the OADA.

The OADA "provides for exclusive remedies within the state of the policies for individuals alleging discrimination in employment on the basis of . . . age [or] disability." 25 O.S. § 1101. Interpreting this provision, the Tenth Circuit found that the OADA preempts separately actionable tort claims—like those made for tortious interference—predicated on the same facts as discrimination claims covered under the OADA. *Jones v. Needham*, 856 F.3d 1284, 1292 (10th Cir. 2017). But the Circuit also highlighted an exception to this rule: The OADA does not preempt separately-actionable tort claims that are based on the same facts as discrimination claims covered under the OADA where the legal theories underpinning the tort and discrimination claims are sufficiently distinct. *Id*. This type of exception is satisfied when, for example, "the separately-actionable tort is 'highly personable' in nature." *Id.* (citing *Brock v. United States*, 64 F.3d 1421, 1424 (9th Cir. 1995) (finding tort claim involving rape to be a "highly personal violation") and *Cunningham v. Skilled Trade Servs., Inc.*, 2015 WL 6442826, at *5 (W.D. Okla., Oct. 23, 2015) (finding tort claim involving assault to be a "highly personal violation").

Plaintiff's Complaint makes clear that the same facts provide the basis for both his age and associational disability discrimination claims and his tortious interference claims. Plaintiff has five pages of facts, Doc. No. 1, pp. 3–7, and states that both his discrimination claims under the OADA, and his tortious interference claims are predicated generally on "the matters alleged above" or the "acts above-described," Doc. No. 1, p. 8, 9, 12, 13. The

question here is thus whether the elements of tortious interference are sufficiently distinct from the elements of age or associational disability discrimination.[9]

Oklahoma defines the elements of a claim for tortious interference as: "(1) interference with a business or contractual right; (2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and (3) damages proximately sustained as a result of the interference." *Tuffy's, Inc. v. City of Okla. City*, 2009 OK 4, ¶14, 212 P.3d 1158.

In comparison, the elements of a claim for age discrimination include: (1) membership in the protected class; (2) qualification for the job; (3) an adverse action; and (4) the job not being eliminated. *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1229 (10th Cir. 2002). The elements of a claim for associational disability discrimination include: (1) qualification for the job; (2) an adverse action; (3) knowledge on behalf of employer that plaintiff had a relative or associate with a disability; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Trujillo v. Pacific Corp*, 524 F.3d 1149, 1154 (10th Cir. 2008).

These elements are not identical, but they are remarkably similar when the alleged malicious conduct is the termination of Plaintiff's employment predicated on Plaintiff's age and associational disability. *See Jones v. Needham*, 856 F.3d 1284, 1292 (10th Cir. 2017) (finding the elements of tortious interference remarkably similar to the elements of

---

[9] The Court determines that Plaintiff's separately-actionable claims for tortious interference are not "highly personable in nature." A lengthy discussion is not needed to demonstrate that claims for interference with a contractual right and a prospective economic advantage are unlike the claims previously identified in this Circuit as "highly personable in nature." *See, e.g., Brock*, 64 F.3d at 1424 (rape); *Cunningham*, 2015 WL 6442826 at *5 (assault); *Brunetti v. Rubin*, 999 F. Supp. 1408, 1412 (D. Colo. 1998) (intentional infliction of emotional distress).

a quid pro quo form of sexual harassment because the alleged malicious conduct for the tortious interference claim was the quid pro quo itself). In accordance with the guidance provided by the Tenth Circuit, Plaintiff's sixth and seventh causes of action for tortious interference are therefore preempted by the OADA. *See id*.

## VIII.  Conclusion

For the reasons stated herein, the Court grants Defendants' Motion to Dismiss, Doc. No. 9, in part, and denies the motion in part. Only Plaintiff's second and third claims pursuant to the Rehabilitation Act remain; all other claims are hereby dismissed.

**IT IS SO ORDERED** this 7th day of February 2020.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE